**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Antonio FERNANDEZ, Jorge Recarey,
Mariano Villa Del Ray,
Defendants–Appellants.**

No. 88–5186.

United States Court of Appeals,
Eleventh Circuit.

Aug. 21, 1989.

As Amended Jan. 16, 1990.

978

Guy M. Turner, Elina de Socarraz, Coral Gables, Fla., David Goodhart, Goodhart & Rosner, Miami, Fla., for Antonio Fernandez.

John W. Nields, Jr., Howrey & Simon, Washington, D.C., for Jorge Recarey.

Lori Barrist, Asst. Federal Public Defender, Miami, Fla., for Mariano Villa Del Ray.

Joseph A. DeMaria, Miami, Fla., Frank J. Marine, U.S. Dept. of Justice, Organized Crime Section, Washington, D.C., for plaintiff-appellee.

Before KRAVITCH and HATCHETT, Circuit Judges, and MARKEY *, Chief Circuit Judge.

KRAVITCH, Circuit Judge:

Antonio Fernandez, Mariano Villa Del Ray, and Jorge Recarey were indicted on one count of conspiracy to illegally influence the operations of an employee-benefit plan. 18 U.S.C. § 371. Del Ray was further indicted for the substantive offense underlying the conspiracy count, and for aiding and abetting the same crime. 18 U.S.C. §§ 2 & 1954. Following a five-week joint trial, a jury convicted the appellants on all indicted crimes. We reverse all three convictions and remand for further proceedings.

## I. BACKGROUND

During the period of the alleged conspiracy, appellant Fernandez was the president of Local 355 of the Hotel and Restaurant Employees Union and a trustee of the Local's Culinary Fund; appellant Del Ray was the personnel director of Doral Hotels of Florida (whose employees were represented by Local 355) and was also a principal representative of the employer trustees of the Culinary Fund. Appellant Recarey is the brother of Miguel Recarey ("Miguel"), who was indicted along with the three appellants but fled prior to trial. The Culinary Fund was responsible for obtaining a contract with a health-care provider to attend to the health-care needs of the Local's membership.

The government charged that Miguel agreed to pay Fernandez a total of $100,000 for his assistance in retaining a health-care contract between the Culinary Fund and International Medical Centers, Inc. ("IMC"), a health-maintenance organization controlled by Miguel. Miguel also hired Fernandez's son, allegedly to prevent Fernandez from disclosing the scheme to the authorities. Recarey was enlisted to assist Miguel make payments to Fernandez. Finally, the government charged that Miguel paid Del Ray $40,000 for his assistance in securing the IMC–Culinary Fund contract.

Documentary evidence showed that Miguel placed Del Ray on the IMC payroll as a marketing representative, paying him approximately $5,000 from November 1980 to July 3, 1981 (July 1, 1981, was the effective date of the IMC–Culinary Fund contract); from July 3, 1981, to April 23, 1982, Del Ray earned the substantially higher salary of $35,000. Del Ray did not disclose to the trustees of the Culinary Fund his employment arrangement with IMC, and told IMC officers to act as if they did not recognize him at the meeting of the Culinary Fund trustees at which IMC made its proposal; Del Ray did however staunchly support IMC's bid for the health-care contract in his capacity as a trustee of the Culinary Fund. Del Ray lost his job with IMC a few days after IMC lost the Culinary Fund contract.

* Honorable Howard T. Markey, Chief U.S. Circuit Judge for the Federal Circuit, sitting by designation.

Evidence adduced against Fernandez showed that Miguel agreed to pay him $75,-000 in 1981 for his assistance in obtaining the contract. The government offered proof that in 1982, after the Culinary Fund trustees became dissatisfied with IMC's performance, Fernandez accepted another $25,000 to help IMC maintain the contract. Further, the government sought to show that Miguel hired Fernandez's son in consideration of Fernandez's efforts on behalf of IMC.

The evidence marshalled against Recarey involved his cashing two IMC checks totalling $75,000 to pay Fernandez; Recarey attempted to conceal his involvement in making these payments. Recarey later asked Miguel for an additional $25,000 for Fernandez.

## II. ADMISSION OF GRAND–JURY TESTIMONY

The government's case against Fernandez and Recarey was materially enhanced by the grand-jury testimony of Manuel Espinosa, a witness who had served as chief of security for IMC and had also been a close associate of Miguel. Espinosa died of natural causes five months after testifying before the federal grand jury that indicted appellants, but the district court ruled his grand-jury testimony admissible under the residual exception to the hearsay rule, Federal Rule of Evidence 804(b)(5). As a substitute for Espinosa's trial testimony, the district court allowed the defense to introduce collateral evidence of Espinosa's lack of credibility. Before we discuss Espinosa's grand-jury testimony and decide whether it was properly received into evidence, we review the law of Rule 804(b)(5).

■ Rule 804(b)(5) provides in pertinent part that:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness [is not excluded by the hearsay rule] if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

The rule thus requires that statements admitted under its authority have "circumstantial guarantees of trustworthiness" equivalent to cross-examined former testimony, statements under a belief of impending death, statements against interest, and statements of personal or family history. These categories of information have attributes of trustworthiness not possessed by the general run of hearsay statements that tip the balance in favor of introducing the information if the declarant is unavailable to testify. *See* 4 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 804(a)[01] at 804–35 (extra-judicial statement falling within a Rule 804(b) category is preferable to losing all evidence from that source).

Thus, admissible former testimony possesses a high degree of reliability because "both oath and opportunity to cross-examine were present in fact." Rule 804 advisory committee's note. Statements under a belief of impending death are rendered more trustworthy than other forms of hearsay because "it can scarcely be doubted that powerful psychological pressures" influence the declarant. *Id.* "[B]ased on experience, logic, and common sense," (*Donnelly v. United States*, 228 U.S. 243, 277, 33 S.Ct. 449, 461, 57 L.Ed. 820 (1913) (Holmes, J., dissenting)), we consider statements against interest reliable because "persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." Rule 804 advisory committee's note. Finally, the exception sanctioning admission of statements of personal or family history "rests on the assumption that the type of declarant specified by the rule will not make a statement about the type of fact covered by the rule unless it is trustworthy." 4 *Weinstein's Evidence, supra,* ¶ 804(b)(4)[01] at 804–166.

■ The oath taken by the declarant is the only attribute possessed by grand-jury

testimony, as a class of information, that could raise its trustworthiness above the level of ordinary inadmissible hearsay. *Garner v. United States*, 439 U.S. 936, 938, 99 S.Ct. 333, 335, 58 L.Ed.2d 333 (1978) (Stewart, J., dissenting from denial of certiorari). An oath alone, however, is an inadequate safeguard to meet the requirement of Rule 804(b)(5) that the statement have "equivalent circumstantial guarantees of trustworthiness"; otherwise, Congress could have dispensed with the cross-examination requirement codified in Rule 804(b)(1). Ordinary grand-jury testimony, therefore, is not admissible under the exception.

Appellants argue that as a textual matter, grand-jury testimony is never admissible under the residual exception to the hearsay rule. Rule 804(b)(1), the exception for judicial testimony by an unavailable declarant, provides in part:

> Testimony given as a witness at another hearing of the same or a different proceeding [is not excluded by the hearsay rule] if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

As grand-jury testimony is given by "a witness at another hearing of the same or a different proceeding" (Fed.R.Evid. 804(b)(1)), appellants urge that such testimony is a statement "specifically covered by [one] of the foregoing exceptions" within the meaning of Rule 804(b)(5), inadmissible under Rule 804(b)(5) because "the party against whom the testimony is ... offered [did not have] an opportunity and similar

motive to develop the testimony by direct, cross, or redirect examination." Fed.R. Evid. 804(b)(1). *United States v. Vigoa*, 656 F.Supp. 1499 (D.N.J.1987), *aff'd*, 857 F.2d 1467 (3d Cir.1988); *contra, United States v. Guinan*, 836 F.2d 350, 354 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2871, 101 L.Ed.2d 907 (1988).

■ We decline to rally behind appellants' call for a *per se* ban on the admission of grand-jury testimony under the residual exception.[1] If a statement does not satisfy all of the requirements of Rule 804(b)(1), then it is not a statement "covered by [one] of the foregoing exceptions" within the meaning of Rule 804(b)(5). We consider admissible those statements that are similar though not identical to hearsay clearly falling under one of the four codified exceptions, if the statements otherwise bear indicia of trustworthiness equivalent to those exceptions. The contrary reading would create an arbitrary distinction between hearsay statements that narrowly, but conclusively, fail to satisfy one of the formal exceptions, and those hearsay statements which do not even arguably fit into a recognized mold. If the proponent can show that a particular piece of hearsay carries "circumstantial guarantees of trustworthiness" equivalent to one of the four codified exceptions, that statement should be admissible regardless of its affinity to a statement falling squarely within a codified exception.

In contrast to several federal appellate courts, our court has never admitted any grand-jury testimony under the authority of Rule 804(b)(5).[2] In *United States v.*

---

1. *Cf. United States v. Metz*, 608 F.2d 147, 157 (5th Cir.1979) (binding precedent in the Eleventh Circuit, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (in banc) ("having failed to meet the corroboration standards of Fed.R.Evid. [804(b)(3)], the statement must also fail the equivalent trustworthiness standards of Rule 804(b)(5)"), *cert. denied*, 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980). *Metz* is not to the contrary. There, the proponent argued that evidence which was too weak to meet the corroboration requirement of Rule 804(b)(3) should nevertheless establish "equivalent circumstantial guarantees of trustworthiness" for Rule 804(b)(5); if the proponent offered nothing but circumstantial guarantees of trustwor-

thiness which were inadequate to satisfy Rule 804(b)(3), the statement by definition lacked guarantees equalling those of the codified exceptions.

2. *E.g., United States v. Marchini*, 797 F.2d 759, 762–65 (9th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987); *United States v. Walker*, 696 F.2d 277, 280–81 (4th Cir.1982), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *United States v. Barlow*, 693 F.2d 954, 960–65 (6th Cir.1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Boulahanis*, 677 F.2d 586, 588–89 (7th Cir.), *cert. denied*,

*Thevis,* 665 F.2d 616 (5th Cir. Unit B),[3] *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303, *cert. denied,* 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370, *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), we noted that:

> Congress intended evidence to be admitted under 804(b)(5) only if the reliability of the evidence *equals* or *exceeds* that of the other exceptions in Rule 804(b).... The Senate Judiciary Committee's report on the Federal Rules of Evidence stated that the 804(b)(5) residual exception was to be used only rarely, in truly exceptional circumstances. Corroborated grand jury testimony which for one reason or another is unavailable at trial is neither rare nor exceptional, and in our opinion its general admission under this theory would constitute a "major revision" of the hearsay rule that, as the Senate Judiciary Committee admonished, is for the legislature, not the judiciary. Grand jury testimony, although given under oath, is not subjected to the vigorous truth testing of cross-examination, as is prior testimony. Grand jury testimony, moreover, is often given under a grant of immunity which might encourage a witness to "embellish" his story.

665 F.2d at 629 (footnote omitted; emphasis in original).

Likewise, in *United States v. Gonzalez,* 559 F.2d 1271 (5th Cir.1977),[4] we held that the grand-jury testimony of an unavailable declarant was not admissible pursuant to Rule 804(b)(5). The declarant was under an explicit threat of criminal contempt should he not testify before the grand jury, a fact that placed great pressure on the declarant to come up with answers whether true or not. If his answers were true, moreover, he faced the threat of retaliation by those he implicated. The declarant's responses were given to leading questions and his testimony was not subject to cross-examination. Finally, we noted that the declarant's oath lost any significance it might otherwise have had in view of the prosecutor's threats of criminal contempt. In light of these observations, we held that the declarant's grand-jury testimony "fail[ed] to pass the test of 'having equivalent [circumstantial] guarantees of trustworthiness.'" *Id.* at 1273 (quoting Fed.R. Evid. 804(b)(5)). In recognizing the distortion that may occur when immunized witnesses answer leading questions posed by partisan attorneys, *Thevis* and *Gonzalez* raise the possibility that grand-jury testimony is among the more unreliable categories of hearsay. *See Garner,* 439 U.S. at 938, 99 S.Ct. at 335 (Stewart, J., dissenting from denial of certiorari) ("That the evidence was first given before a grand jury adds little to its reliability. In grand jury proceedings, the ordinary rules of evidence do not apply. Leading questions and multiple hearsay are permitted and common. Grand jury investigations are not adversary proceedings. No one is present to cross-examine the witnesses, to give the defendant's version of the story, or to expose weaknesses in the witnesses' testimony.").

■ Although our review of the law of Rule 804 does not suggest a *per se* rule against the admission of grand-jury testimony, fidelity to the scheme created by Congress and to our own precedent leads to the conclusion that only extraordinarily trustworthy grand-jury testimony could possibly be admissible as proof of the matter asserted. We need not say much more to decide this case: to honor the language in Rule 804(b)(5) requiring that "the general purposes of [the Federal Rules of Evidence] and the interests of justice ... best be served by the admission of the statement into evidence," we certainly could not

459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. Carlson,* 547 F.2d 1346, 1352–60 (8th Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).

**3.** The Eleventh Circuit, in *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), adopted as precedent decisions of the former

Fifth Circuit, Unit B, rendered after September 30, 1981.

**4.** The Eleventh Circuit, in the in banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

sanction admission of proffered grand-jury testimony if its trustworthiness and reliability were open to troubling doubt. Espinosa's testimony does not even pass this low threshold; thus, the government has hardly shown that Espinosa's testimony was so extraordinary that its trustworthiness rises to the level of the four concrete exceptions codified in Rule 804(b).

■ Apart from the fact that Espinosa testified under a grant of immunity and responded to pregnant questions put by the United States attorney—which as an initial matter suggests that his testimony is no more trustworthy than ordinary inadmissible grand-jury testimony—Espinosa himself was an almost comically unreliable character. A few illustrations culled from the many proffered by appellants will suffice. Espinosa informed the FBI agent working on the IMC case that he had been employed at various times by the CIA, the KGB, the Cuban and Israeli intelligence services; he boasted of his acquaintance with several heads of state. He admitted to making under oath and to a government official a series of false statements regarding a drug investigation. He falsely told the grand jury that he had not been granted immunity for his appearance; he told the grand jury that IMC had financed the movies "Raiders of the Lost Ark" and "Star Wars." Several libel suits were pending against him at the time of his grand-jury appearance. Moreover, Espinosa admitted to being under the influence of an extensive list of medications during his grand-jury appearance, and he conceded having difficulty recollecting the conversation he was testifying about, which had occurred several years earlier.

The government proposes the nice distinction between the truthfulness of an isolated statement and the over-all credibility of a particular witness. See United States v. Layton, 720 F.2d 548, 562 (9th Cir.1983) (confrontation-clause analysis of statements made by deceased declarant, the Rev. Jim Jones: "Merely because a person is somewhat irrational, or highly agitated, does not mean that he cannot relate events that have occurred recently or have personal knowledge of events about to take place."), cert. denied, 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984). A distinction exists, but the government cannot seriously argue that the trust due an isolated statement should not be colored by compelling evidence of the lack of credibility of its source: although a checkout-aisle tabloid might contain unvarnished Truth, even a devotee would do well to view its claims with a measure of skepticism. See Dallas County v. Commercial Union Assurance Co., 286 F.2d 388, 397 (5th Cir.1961) (Wisdom, J.) (recognizing that source of information influences conclusion about information's reliability: small-town newspaper in 1901 would not likely have reported a courthouse fire if in fact there had been no fire).

■ Second, corroborating evidence and circumstances, while extant, do not persuade us that the testimony was admissible. We noted in Thevis that corroborated grand jury testimony "is neither rare nor exceptional," 665 F.2d at 629; accordingly, to tip the balance in favor of admissibility, corroborating evidence must be extraordinarily strong. There is nothing unusually compelling about the corroborating evidence marshalled by the government and relied upon by the district court, which is summarized in the margin.[5]

---

5. (1) Avello, a brother-in-law of Miguel and Recarey, testified that Recarey told him of assisting Miguel to pay $75,000 to the union by cashing checks in that amount, and Recarey expressed concern that the I.R.S. would question the checks; (2) documentary evidence established that Recarey received two checks from IMC totalling $75,000 and withdrew $58,000 over a ten-day period, IMC subsequently wrote these checks off as bad loans; (3) Batista, formerly chief of security for IMC, testified that he overheard Recarey tell Miguel that Recarey

"needed $25,000 more for Tony" from the union; that same month, Recarey received $25,000 which was never reported to the I.R.S.; (4) Miguel hired Fernandez's son shortly after he became aware of the grand-jury investigation, at a higher pay-scale than other marketing representatives; (5) testimony at trial confirmed Espinosa's description of the inside of Miguel's house and confirmed that Espinosa was a close friend of Miguel; (6) Espinosa related a conversation within his personal knowledge, and Miguel had told Espinosa facts within Miguel's

Third, Espinosa's testimony contained many instances of hearsay within hearsay; piled on top of the particular weaknesses of grand-jury testimony, therefore, are the other problems that led the common-law courts to develop the rule excluding hearsay testimony. Although the government has argued that each individual piece of double or triple hearsay would come in under one of the standard exceptions, *see* Fed.R.Evid. 805, experience suggests an inverse relationship between the reliability of a statement and the number of hearsay layers it contains.

We reject the government's argument that these factors go solely to the weight the jury should assign to Espinosa's testimony as opposed to the threshold legal question of admissibility. Because these factors speak persuasively to the question of the trustworthiness of the particular grand-jury testimony, they are matters to be considered initially by the district court when deciding admissibility under Rule 804(b)(5). In this regard, the very need perceived by the district court to allow the defendants to introduce collateral evidence of Espinosa's unreliability strongly suggests that his testimony should not have been admitted in the first place.

■ The admission of Espinosa's grand-jury testimony thus constituted reversible error. The government concedes that such error was not harmless as to Fernandez; as to Recarey, we find that the error "had substantial and injurious ... influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). Recarey was prejudiced by this evidence because the government's case against him

centered around a $75,000 payment he received from IMC. The government elicited testimony from Espinosa that Fernandez had been paid $75,000; at closing, the government sought to link the two payments. As both Fernandez and Recarey were prejudiced by the introduction of Espinosa's testimony, we must reverse both convictions and remand for a joint trial.[6]

Del Ray too argues that he was prejudiced by the introduction of Espinosa's testimony; the government responds that any error was harmless beyond a reasonable doubt because Espinosa's testimony did not mention Del Ray, and asserts that Del Ray's conviction was premised upon "wholly independent evidence." We will consider the implications of this assertion before deciding whether to reverse the case against Del Ray.

## III. TWO CONSPIRACIES

Del Ray argues that the government's proof established two conspiracies instead of the single conspiracy charged in the indictment. Thus, instead of a Miguel–Recarey–Fernandez–Del Ray conspiracy, Del Ray claims that the evidence showed a Miguel–Recarey–Fernandez conspiracy and a Miguel–Del Ray conspiracy. Del Ray argues that the trial judge should have severed his case from the case against Recarey and Fernandez. Initially, we note that Del Ray's claim on appeal is framed in terms of both Rule 8(b) and Rule 14 of the Federal Rules of Criminal Procedure; however, although Del Ray did join in Fernandez's motion for a Rule 8(b) severance prior to trial, Del Ray did not move for a Rule 14

personal knowledge; (7) Miguel's statements were against his penal interest; (8) Espinosa voluntarily provided the information to the grand jury; (9) Espinosa was testifying under oath; (10) Espinosa "had the knowledge of his impending death when he testified"; and (11) Espinosa never recanted his grand-jury testimony.

The testimony of Avello and Batista is, on its face, the most compelling corroboration offered; both witnesses, however, had been fired from IMC, and Avello had been promised immunity for his testimony. With regard to the finding of the district court that Espinosa had a

belief of impending death when he testified, we note simply that even if a death several months in future can be described as "impending," this finding would not suffice to bring Espinosa's statements within the exception in Rule 804(b)(2) because Espinosa was not testifying as to the cause or circumstances of his impending death.

6. Because we hold that Espinosa's testimony should be excluded at retrial, we need not address appellants' confrontation-clause arguments.

severance from Fernandez and Recarey.[7]

We recently concluded, "[a]fter carefully reviewing the great body of case law on this issue," that "Rule 8(b) is a pleading rule and joinder under Rule 8(b) is to be determined before trial by examining the allegations contained in the indictment." *United States v. Morales*, 868 F.2d 1562, 1567 (11th Cir.1989). Under Rule 8(b), Del Ray's claim probably would be meritless. Count one of the indictment under scrutiny alleged a single conspiracy between Del Ray, Miguel, Recarey and Fernandez. For an overt act in furtherance of that conspiracy, the indictment alleged a meeting at Miguel's house attended by all four defendants. These allegations, charging that all four defendants engaged in the same overt act, were likely sufficient to comply with the requirements of Rule 8(b).

■ A misjoinder or prejudicial joinder claim based on evidence adduced at trial, like the claim Del Ray raises, falls under Rule 14 of the Federal Rules of Criminal Procedure. *Schaffer v. United States*, 362 U.S. 511, 514, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1960); *Morales*, 868 F.2d at 1568 ("We believe that whether joinder is improper based on events occurring at trial is best dealt with under Rule 14."); *see generally* 8 R. Cipes, Moore's Federal Practice ¶ 8.06[3] at 8–34 (1989). The government asserts that Del Ray waived his rule 14 claim. Because of language in some of our

cases, however, Del Ray's counsel may reasonably have thought that a pre-trial Rule 8(b) motion preserved a misjoinder claim for appellate review in light of the evidence admitted at trial. *E.g., United States v. Andrews*, 765 F.2d 1491, 1497 (11th Cir. 1985) ("To resolve appellants' Rule 8(b) claim, it is necessary to look beyond the face of the indictment, ... as it is the lack of correspondence between the face of the indictment and the evidence on which the trial proceeded that is the source of the challenge."),[8] *cert. denied,* 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986); *also, United States v. Castro*, 829 F.2d 1038, 1044–45 (11th Cir.1987), *modified on other grounds*, 837 F.2d 441 (11th Cir.1988). In light of the special circumstances created by this language, and because we could review the basis of Del Ray's prejudicial-joinder claim incidentally to the review of the whole record that we must conduct to determine whether the mistaken introduction of Espinosa's testimony prejudiced Del Ray, we will treat Del Ray's Rule 8(b) claim as a properly preserved Rule 14 claim.

A. *Sufficiency of the evidence to prove a single conspiracy*

The government sought to prove a "wheel" conspiracy, with Miguel the hub from which two spokes extended. *See United States v. Nettles*, 570 F.2d 547, 551

---

7. Rule 8(b), entitled "Joinder of Defendants," provides that:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Rule 8(b), Fed.R.Crim.P.

Rule 14, entitled "Relief from Prejudicial Joinder," provides in pertinent part that:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Rule 14, Fed.R.Crim.P.

8. *Andrews* effectively anticipated the Supreme Court's decision in *United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), in which the Court reversed a line of former Fifth and Eleventh Circuit decisions that held prejudice presumed once a Rule 8(b) misjoinder was demonstrated on appeal. To the extent that *Andrews* held that a Rule 8(b) claim can be reviewed in light of evidence admitted at trial, however, it was inconsistent with *Schaffer*, which the Supreme Court reaffirmed in *Lane*, 474 U.S. at 447, 106 S.Ct. at 731 ("the *Schaffer* Court held that once the Rule 8 requirements were met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14"). *See also United States v. Grassi*, 616 F.2d 1295, 1302 (5th Cir.) ("Whether joinder is sound under Rule 8(b) is to be determined from the face of the indictment."), *cert. denied,* 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980).

986

(5th Cir.1978). One spoke consisted of Fernandez and Recarey, the other consisted solely of Del Ray.

For a wheel conspiracy to exist those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise. *Blumenthal v. United States*, 332 U.S. 539, 556–57, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947). Otherwise the conspiracy lacks "the rim of the wheel to enclose the spokes." *Kotteakos v. United States*, 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946). If there is not some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object, the "wheel" is incomplete, and two conspiracies rather than one are charged.

*United States v. Levine*, 546 F.2d 658, 663 (5th Cir.1977). If there is one conspiracy, then there must be evidence to show that Del Ray and the Fernandez–Recarey spoke engaged in some interaction concerning a common illegal object. At the outset it is crucial to distinguish between the two different objects that thread through this case. The primary object driving all of the indicted activities was a contract between IMC and the Culinary Fund. This object is plainly lawful. The second object concerns the means through which the first object was to be achieved. This second object, to bribe certain of the Culinary Fund trustees, is plainly unlawful. Appellants do not dispute that the government's proof showed that Del Ray, Fernandez, Recarey, and Miguel joined together to advance the primary, lawful object. Nor do appellants dispute that the government's proof sufficed to show a conspiracy between Fernandez, Recarey and Miguel to effect the unlawful object, and we conclude *infra* Part IV that the government demonstrated that Miguel and Del Ray actually achieved the

unlawful object. What we find lacking is proof that *everyone*—Del Ray, Fernandez, Recarey, and Miguel—conspired together to advance the unlawful object.

The government advances two theories to establish an overarching conspiracy. First, the government argues that proof that Fernandez and Del Ray both attended a meeting at Miguel's home at which the IMC proposal was discussed is sufficient to link the two defendants in a conspiracy. This meeting was the sole overt act with which both Fernandez and Del Ray were charged; Del Ray was charged with no overt act in which Recarey participated. A government witness testified to the meeting, but his testimony fails to suggest that any wrongdoing transpired. Although Fernandez and Del Ray were each trustees of the Culinary Fund, the government has not argued that ex parte contracts between potential health-care contractors and Culinary Fund representatives are somehow suspect so that Del Ray should have realized that Fernandez's presence signalled complicity in a clandestine enterprise.

■ Accordingly, the evidence of the meeting at Miguel's home shows a discussion susceptible of either an illegal or legal interpretation, and as such cannot be used to establish a conspiracy. *United States v. Wieschenberg*, 604 F.2d 326, 335–36 (5th Cir.1979). Nothing at all shows that the meeting aided the unlawful object—the plan to bribe certain of the trustees; at most, the meeting was useful in advancing the primary object—an IMC–Culinary Fund health-care contract.[9] *Cf. United States v. Hajecate*, 683 F.2d 894, 896 (5th Cir.1982) (transactions not illegal in themselves lose their legal character if used to bring about an unlawful object), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983).

9. The dissent emphasizes that "nothing in the evidence demonstrates that Miguel, Fernandez, Recarey and Del Ray were involved in a legal activity ... i.e., pursuing legal means to obtain the contract for IMC." The dissent would shift the burden of proof to appellants to show that the meeting at Miguel's home concerned a lawful purpose. Appellants did not bear any such burden. Lawfulness of purpose is not an affirmative defense to conspiracy; rather, unlawfulness of purpose is an element of the crime. As the government failed to offer any evidence that an illegal agreement transpired at Miguel's home, appellants had no inference to rebut, and the government's remaining evidence had no inference to confirm.

Second, the government argues that Del Ray and the Fernandez–Recarey spoke constituted a single conspiracy because all three appellants worked to effect the same result; as phrased by the government: "Here, it is clear that the indictment charged, and the evidence established, that appellants worked to achieve a shared purpose—to secure and retain a health care contract for IMC from the Culinary Fund." This argument is flawed because it asserts that the mere agreement to advance a lawful object can support a conspiracy charge. If persons pursuing a lawful end are to be prosecuted as conspirators, the government must show that they agreed to use criminal means to pursue that end, for it is fundamental to the law of conspiracy that the government show an agreement between two or more persons to commit a *crime.* *United States v. Wilson,* 657 F.2d 755, 758 (5th Cir.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982); *see also Pettibone v. United States,* 148 U.S. 197, 203, 13 S.Ct. 542, 545, 37 L.Ed. 419 (1893); W. LaFave and A. Scott, *Criminal Law* § 62 at 471 (1972); *cf. United States v. Rapp,* 871 F.2d 957, 964 (11th Cir.1989) (indictment and proof showed that objectives of conspiracy were to defraud bank and misapply its funds; defendants "misread the indictment when they state[d] that the sole objective" was a lawful one—to take over the bank).

Similarly, the government does not raise the inference of conspiracy indirectly merely by showing that Del Ray was aware of the need for other trustees to support IMC's effort to secure the contract. Even if a jury could conclude that Del Ray knew that others would work to secure an IMC–Culinary Fund contract, the government still must show that Del Ray knew that others would employ unlawful means. *United States v. Marable,* 574 F.2d 224, 229 (5th Cir.1978) (defendant must have knowledge of the existence of a

conspiracy, and with that knowledge do something to further it). The government has not argued, for example, that any evidence showed Del Ray knew of the sums paid to Fernandez; like as not Del Ray was unaware that another party was on the take.

The government could have proven the conspiratorial agreement by showing that Fernandez and Del Ray had knowledge that another Culinary Fund trustee was accepting illegal bribes for the purpose of inducing the contract. *See Rapp,* 871 F.2d at 964–65 (evidence showed that defendants had knowledge of illegal object of conspiracy that may also have had a lawful object); *cf. United States v. Diecidue,* 603 F.2d 535, 556 (5th Cir.1979) (RICO prosecution; "Without evidence that [the defendant] knew something about his co-defendants' related activities which made the enterprise, he could not be convicted of conspiring to engage in a pattern of racketeering as defined by the statute."), *cert. denied* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, *cert. denied,* 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980). If the government had shown, for example, that Del Ray knew some other trustee was to be bribed to vote in favor of the contract with IMC,[10] the government would not be obliged to prove that Del Ray knew that the other person was Fernandez in order to prosecute Del Ray for conspiring with Fernandez and Recarey. *E.g., United States v. James,* 528 F.2d 999, 1011 (5th Cir.), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976). Without such direct evidence the government might have shown that Del Ray knew that the Culinary Fund could be induced to contract with IMC only if some other trustee were bribed. The government does not make this argument, and our review of the record does not convince us that IMC's only possible hope to secure the contract

---

10. *E.g., United States v. Caporale,* 806 F.2d 1487, 1500 (11th Cir.1986) (alternative holding) (evidence showed that defendant union officials each knew that other union officials were using their positions of authority to secure kickbacks), *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679, *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987); *United States v. Kendall,* 665 F.2d 126 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982).

988

would be through illegal influence.[11] On this ground we distinguish the numerous cases cited by the government involving the distribution of illegal narcotics,[12] traffic in stolen goods,[13] or operation of a prostitution ring[14]—objects that can *only* be accomplished through criminal agency. Generally speaking, proof that a party knew that he alone could not accomplish an unlawful object permits the inference of a conspiracy between the party and those persons foreseeably required to effect the object, whether or not the party knows the identity or specific activities of the others. *Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947) (defendants conspiring to sell whiskey at prices above official ceiling "knew or must have known that others unknown to them were sharing in so large a project").

No proof is offered to show that Del Ray engaged in concerted activity with Fernandez and Recarey that "both increase[d] the likelihood that the criminal object [would] be successfully attained and decrease[d] the probability that the individuals involved [would] depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961). The salient question becomes whether Del Ray, Miguel, Fernandez and Recarey were nevertheless properly charged in one indictment and tried at the same trial in view of the undeniable similarity of their alleged activities. On this point our decision in *United States v. Marionneaux* is instructive. 514 F.2d 1244 (5th Cir.1975), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). The indictment in *Marionneaux* charged two conspiracies in two separate counts; the object of each conspiracy was to interfere with the pending criminal trial of Edward Partin, but "the manner of interference was different in each case and, except for Partin as a common defendant, the conspirators were all different in each count." 514 F.2d at 1247. In the first conspiracy, the conspirators sought to obstruct justice "by supplying sustenance and transportation" to a subpoenaed witness in order to prevent his appearance before a federal grand jury in Louisiana and to insure his false testimony at Partin's criminal trial in a Texas district court. *Id.* In the second conspiracy, the conspirators sought to persuade a different witness not to testify at Partin's criminal trial. We held that the two counts did not constitute "a series of acts or transactions constituting an offense or offenses" for the purposes of Rule 8(b), and were thus improperly joined in the same indictment. *Id.* at 1249.

 The similarities between *Marionneaux* and this appeal are readily apparent. In each, two conspiracies[15] were

11. The ten trustees of the Culinary Fund voted unanimously to enter into a contract with IMC. The government charged only two trustees with having sold their vote.

12. *E.g., United States v. Towers*, 775 F.2d 184 (7th Cir.1985); *United States v. Percival*, 756 F.2d 600 (7th Cir.1985); *United States v. Cole*, 755 F.2d 748 (11th Cir.1985); *United States v. Barlin*, 686 F.2d 81 (2d Cir.1982); *United States v. Martino*, 664 F.2d 860 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); *United States v. Grassi*, 616 F.2d 1295 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980); *United States v. Metz*, 608 F.2d 147 (5th Cir.1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980); *United States v. Michel*, 588 F.2d 986 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *United States v. Ashley*, 555 F.2d 462 (5th Cir.), *cert. denied*, 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977).

13. *E.g., United States v. Orr*, 825 F.2d 1537 (11th Cir.1987); *United States v. Davenport*, 808 F.2d 1212 (6th Cir.1987); *United States v. Solomon*, 686 F.2d 863 (11th Cir.1982); *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

14. *E.g., United States v. LeCompte*, 599 F.2d 81 (5th Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 759 (1980).

15. We assume without deciding that Del Ray could be charged and convicted of conspiracy to violate 18 U.S.C. § 1954. Although there appear to be no reported cases on point, Del Ray could argue that Wharton's Rule forbids prosecuting him for conspiracy to violate section 1954, if the only coconspirator involved was the person who paid him a bribe. *See United States v. Pacheco*, 489 F.2d 554, 558–59 (5th Cir.1974) ("Wharton's rule is applicable only when more than one party is necessary to perform the basic crime. It prevents prosecution for conspiracy only

formed to advance a result which in the abstract is entirely legal—in *Marionneaux,* the ultimate goal of each conspiracy was to win acquittal for a specific criminal defendant; in this appeal, the ultimate goal of each conspiracy was for IMC to secure a health-care contract with the Culinary Fund. The two conspiracies in both *Marionneaux* and the instant case had a common member. The two conspiracies in each case used similar but not identical strategies to effect their ultimate goal. Had the government charged two separate conspiracies in the instant case, *Marionneaux* would have dictated a severance under Rule 8(b).[16]

### B. *Prejudice?*

■ Del Ray was improperly joined with Fernandez and Recarey. Because the improper joinder was not apparent until the government had presented its case, however, Del Ray has presented a Rule 14 claim and must therefore meet the burden of demonstrating prejudice under that rule. An appellant's showing of prejudice under Rule 14 is normally intertwined with proof that the trial court abused its discretion. In the special circumstances of this case,

because of an attorney error that we have forgiven, we have no exercise of discretion to review.[17] Our inquiry is thus limited to whether denial of a Rule 14 motion to sever would have constituted an abuse of discretion. Under the unique facts of this case, we conclude that denial of Del Ray's Rule 14 motion would not have been within the trial court's discretion.

■ Because of our concern for judicial economy and the related principle that defendants jointly indicted should be so tried, the Rule 14 appellant ordinarily must demonstrate "compelling prejudice" flowing from the denial of his motion to sever. *United States v. Varella,* 692 F.2d 1352, 1360 (11th Cir.1982), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1392, *cert. denied,* 464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983); *United States v. Lippner,* 676 F.2d 456, 464 (11th Cir.1982); *United States v. Perez,* 489 F.2d 51, 65 (5th Cir.1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). To decide whether the appellant has demonstrated "compelling prejudice," the reviewing court must ask:

---

where the proscribed type of conduct cannot take place without such concert of action;" (*citing United States v. Dietrich,* 126 F. 664 (C.C.D. Neb.1904) (bribery) *and People v. Wettengel,* 98 Colo. 193, 58 P.2d 279 (1935) (bribery))),, *cert. denied,* 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975). *See infra* note 18.

16. Recarey argues that he was prejudiced by the trial court's refusal to give the jury a multiple-conspiracies charge, which was clearly error in light of our finding that the government's proof established two conspiracies. Recarey does not contend that a finding of two conspiracies should compel the conclusion that insufficient evidence was presented to establish his involvement in the Miguel–Recarey–Fernandez conspiracy. Rather, he uses the finding of two conspiracies as a stepping-stone to the argument that his prosecution was time-barred. To prosecute Recarey, the government had to prove an overt act in furtherance of the Miguel–Recarey–Fernandez conspiracy committed by one of the three conspirators within the applicable limitations period. The government offered only one such overt act: a trip to Atlanta taken by Fernandez. To prove that act, the government called an FBI agent who testified that Fernandez admitted the act to him in an interview

conducted during the federal investigation. This evidence was admissible against Fernandez under Federal Rule of Evidence 804(b)(3) as a statement tending to subject the declarant to criminal liability. Recarey argues that as Fernandez did not make this statement *during the course and in furtherance of* the Miguel–Recarey–Fernandez conspiracy, the statement was not admissible against Recarey under the coconspirator exception. *Cf.* Fed.R.Evid. 801(d)(2)(E). Because it was admissible against Fernandez, however, and Fernandez's acts are imputable to Recarey, the government did prove that Recarey was chargeable with an overt act within the limitations period. *United States v. Alvarez,* 755 F.2d 830, 847–48 (11th Cir.), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985), *cert. denied,* 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 380 (1987).

17. The correct procedure would have been for Del Ray to renew his motion for severance at the close of the government's evidence or at the close of the trial. *E.g., United States v. Figueroa–Paz,* 468 F.2d 1055, 1057 (9th Cir.1972). The district court could have determined whether Del Ray was prejudiced by the misjoinder, and we would have reviewed that conclusion for an abuse of discretion.

Whether under all circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted. *Varella,* 692 F.2d at 1360 (*quoting Tillman v. United States,* 406 F.2d 930, 935 (5th Cir.), *vacated,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969) *and Peterson v. United States,* 344 F.2d 419, 422 (5th Cir.1965)). The instant case does not present a typical Rule 14 question, however, for Del Ray has been able to show with the benefit of hindsight that the indictment incorrectly charged a single conspiracy. If the defendants ought not to have been jointly indicted, clearly no principle holds that they should have been jointly tried; the concern we normally would have for judicial economy is not nearly as strong when we see that Del Ray was entitled to a separate trial in the first place. The *Schaffer* Court sanctioned a more lenient prejudice standard for appellants who can show as a matter of law that joinder was incorrect notwithstanding a facially sufficient indictment: although a trial judge is under a continuing duty to grant a severance when sufficient prejudice appears, "where, as here, the charge which originally justified joinder turns out to lack the support of sufficient evidence, a trial judge should be particularly sensitive to the possibility of such prejudice." *Schaffer,* 362 U.S. at 516, 80 S.Ct. at 948. Moreover, due to the erroneous admission of the Espinosa hearsay, the jury had more before it than "the evidence that is relevant to each defendant." *Cf. Varella,* 692 F.2d at 1360. For these reasons, Del Ray should not be held to the ordinary Rule 14 prejudice test.

■ Del Ray has shown that joinder, although technically correct, was erroneous because "the charge which originally justified joinder turn[ed] out to lack the support

of sufficient evidence" (*Schaffer,* 362 U.S. at 516, 80 S.Ct. at 948); in *United States v. Lane,* the defendants were able to show that joinder was legally incorrect. 474 U.S. 438, 443–44, 106 S.Ct. 725, 728–29, 88 L.Ed.2d 814 (1986). The prejudice suffered by a misjoined defendant under either set of facts is not appreciably different and the countervailing concern for judicial economy is similar in both cases; thus, the prejudice test announced in *Lane* is suited to the facts of this case: "an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" 474 U.S. at 449, 106 S.Ct. at 732 (*quoting Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253). In a recent case arising under Rule 8(a) (which governs joinder of claims against a single defendant) we interpreted *Lane* to call for a "determination of whether there was a reasonable chance the jury might not have convicted" the defendant had the misjoinder not occurred. *United States v. Watson,* 866 F.2d 381, 385 (11th Cir.1989). Assuming without deciding that the same test applies for claims of misjoined defendants, we see a "reasonable chance" that Del Ray would not have been convicted had he not been tried with Fernandez and Recarey; at the very least, the case against Fernandez and Recarey had a "substantial and injurious effect" on the jury's determination of Del Ray's guilt.

The Espinosa testimony constituted the most damaging direct evidence of illegality surrounding the Culinary Fund's retention of a health-care contract from IMC—this grand-jury hearsay was the flame in the midst of a great deal of smoke. Even though we hold *infra* Part IV that sufficient evidence was adduced against Del Ray to convict him of bribery under 18 U.S.C. § 1954, we cannot fail to appreciate that the evidence against him was wholly circumstantial. Without intimating that a mere lack of direct evidence against Del Ray should have called for a severance, our major concern under all the circumstances of this case is that the admissible and inad-

missible direct evidence against Fernandez and Recarey likely set the stage for the case against Del Ray, with the resulting risk too great that the jurors, "ready to believe that birds of a feather are flocked together," *Krulewitch v. United States*, 336 U.S. 440, 454, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring), transferred guilt to Del Ray. Accordingly, we reverse Del Ray's conviction and remand with directions to sever his case for a new trial.

## IV. EVIDENCE AGAINST DEL RAY

Del Ray claims that the government adduced insufficient evidence to convict him of the indicted crimes. Because Del Ray's success on this claim would preclude a subsequent trial on grounds of former jeopardy, we must resolve it in spite of our decision to remand the case against him.

The government charged Del Ray with the substantive offense of accepting a bribe and with conspiracy; the gravamen of Del Ray's argument is that the government did not produce enough evidence to convict him of bribery. Only this argument do we address.[18]

In reviewing a jury conviction for sufficiency of the evidence, we consider the evidence admitted at trial " 'in the light most favorable to the government, accepting all reasonable inferences that support the verdict,' ... mindful that the evidence need not 'exclude every reasonable hypothesis of innocence [nor] be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.' " *United States v. Migueles*, 856 F.2d 117, 118 (11th Cir.1988) (*quoting United States v. Curra–Barona*, 706 F.2d 1089, 1091 (11th Cir.1983), *cert. denied*, 465 U.S. 1031, 104 S.Ct. 1296, 79 L.Ed.2d 696 (1984) *and United States v. Bell*, 678 F.2d 547, 549 (5th Cir.Unit B 1982) (in banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).

Del Ray argues that the only evidence tying him to the conspiracy was his presence at the gathering at Miguel's house and the happenstance of his employment by IMC. Del Ray acknowledges a conflict of interest and asserts that his conduct can be explained in terms of his desire to conceal the conflict from his employer Doral Hotels. Viewing the evidence in the light most favorable to the government, however, there was sufficient evidence from which the jury could have found Del Ray guilty of the substantive offense of accepting a bribe.[19] The jury was within reason in drawing the inference that Del Ray was offered a job as quid pro quo for his assistance to IMC.[20]

---

**18.** We have concluded that only Del Ray and Miguel participated in the Del Ray spoke; Wharton's Rule may now prevent the government from proceeding under the theory that Del Ray and Miguel committed conspiracy to pay a bribe to Del Ray. *See supra* note 15. Wharton's Rule provides that:

> An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.

1 Anderson, Wharton's Criminal Law and Procedure § 89 (1957), *quoted in United States v. Revel*, 493 F.2d 1, 2 (5th Cir.1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1559, 43 L.Ed.2d 774 (1975).

Del Ray does not argue the applicability of Wharton's Rule, and as we remand the case for retrial, we think it proper that the district judge consider the issue first should the government continue to proceed against Del Ray on a conspiracy theory.

**19.** The government presented evidence tending to show that Del Ray did not provide bona fide services to IMC, that Miguel informed IMC's director of marketing that Del Ray was going to help IMC get the union contract, that Del Ray championed IMC before the trustees of the Culinary Fund, that Del Ray's employment with IMC was not a normal association but was actually illegal in itself, that Del Ray's compensation increased dramatically after the IMC–Culinary Fund contract was negotiated, and that Del Ray was fired almost immediately following the termination of the contract.

**20.** We need not address Del Ray's argument that the district court abused its discretion in admitting Rule 404(b) evidence against him; he will have the opportunity to challenge the evidence again at retrial. We note simply that the evidence—tending to show that he had earlier conspired to induce the Culinary Fund to contract with another health-care provider—might be probative of the truthfulness of his "mere con-

## V. CONCLUSION

We REVERSE the conviction of each appellant and REMAND with instructions to sever the case against Del Ray from the case against Recarey and Fernandez in order to permit the government to retry Recarey, Fernandez and Del Ray in accordance with our opinion.

HATCHETT, Circuit Judge, concurring in part and dissenting in part:

I concur in part and dissent in part with the majority's decision. I agree with the majority that the admission of Espinosa's grand jury testimony constitutes reversible error, and therefore, would reverse the conspiracy convictions against Fernandez, Recarey, and Del Ray. Furthermore, I concur in the majority's decision to affirm Del Ray's conviction for illegally influencing the operation of an employee-benefit plan. I dissent, however, from the majority's decision to sever Del Ray's conspiracy trial from the conspiracy trial against Fernandez and Recarey.

While I concede that the government must present evidence to demonstrate that Del Ray and Fernandez interacted concerning a common illegal object, I disagree with the majority's conclusion that the government did not present sufficient evidence of such interaction; viewing the evidence most favorably toward the government, the jury could reasonably conclude that Fernandez, Del Ray, Recarey, and Miguel participated in a single conspiracy. *See Levine*, 546 F.2d at 663.

The government demonstrated that Miguel, Fernandez, Del Ray and Recarey privately met prior to IMC obtaining the contract, and that after this meeting Miguel made payments to Fernandez and Del Ray. The jury could rely on the meeting between Fernandez, Del Ray, Recarey and Miguel to find the requisite connection between Fernandez and Del Ray, notwithstanding the former Fifth Circuit's decision in *Wieschenberg*. In *Wieschenberg*, the court held

that the government cannot use "mere discussions susceptible of either an illegal or a legal interpretation" to establish a conspiracy. *Wieschenberg*, 604 F.2d at 335. The *Wieschenberg* court, however, expressly limited its holding to cases where the alleged conspirators were "involved in both legal and illegal activities." *Wieschenberg*, 604 F.2d at 335 n. 8. Contrary to the majority's conclusion, nothing in the evidence demonstrates that Miguel, Fernandez, Recarey and Del Ray were involved in a legal activity ... i.e., pursuing legal means to obtain the contract for IMC. Moreover, unlike *Wieschenberg*, no evidence dispels the plausibility of the jury's inference that the meeting concerned the subsequent bribes. Rather, the evidence supports the inference of unlawful activity at this meeting because the government presented evidence of subsequent payments from Miguel to Fernandez and Del Ray.

Therefore, I would affirm denial of Del Ray's severance motion because the government properly tried the appellants as a single conspiracy. I would accordingly order the retrial of the appellants on the conspiracy count in a single trial without the introduction of Espinosa's grand jury testimony.

---

flict of interest" defense. *Cf. United States v. Walther*, 867 F.2d 1334, 1343 (11th Cir.1989) (evidence of prior misconduct admissible to

show predisposition necessary to rebut defendant's allegation of entrapment).